IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| J.N., by his parents,<br>              Plaintiff, | )<br>)<br>) | |
| vs. | )<br>) | Civil Action No. 06-1708<br>Judge McVerry |
| PITTSBURGH CITY SCHOOL<br>DISTRICT,<br>              Defendant. | )<br>)<br>)<br>) | Magistrate Judge Mitchell |

REPORT AND RECOMMENDATION

I.      Recommendation

        It is respectfully recommended that the motion for summary judgment submitted on

behalf of Plaintiff (Docket No. 15) be denied.  It is further recommended that the motion for

summary judgment submitted on behalf of Defendant (Docket No. 20) be granted.

II.     Report

        Plaintiff, J.N., by his parents, brings this action against Defendant, the Pittsburgh City

School District ("the School District"), under the Individuals With Disabilities Education Act, 20

U.S.C. §§ 1400-82 (IDEA).  He alleges that he has been deprived of a free appropriate public

education ("FAPE") under the IDEA in that he did not make appropriate progress during the

2004-2005 school year, he was not provided with an appropriate Reevaluation Report and he was

not supervised in his Approved Private School placements.  A hearing officer ruled in his favor

and held that he was entitled to compensatory education in the form of five full school days per

week for each school week of appropriate special education and related services denied him from

the start of the 2004-2005 school year through the end of the 2005-2006 school year.  However,

the Special Education Due Process Appeals Review Panel reversed this decision.  Plaintiff

contends that the latter decision was contrary to law, not supported by the evidence of record and characterized by bias.

Presently before this Court for disposition are cross-motions for summary judgment. For the reasons that follow, the motion filed by Plaintiff should be denied and the motion filed by Defendant should be granted.

Facts

J.N. was born on August 4, 1997 and resides within the School District. (Multidisciplinary Evaluation Report Oct. 5, 1999.)[1] He has been diagnosed with autism and pervasive developmental disorder. (Def.'s App. Attach. G, I.) He is not verbal. (ODR Tr. 25.) On September 3, 1999, J.N. was referred to early intervention services, which he received at Brookline Elementary, a Pittsburgh Public School, through his kindergarten year. (ODR Tr. 25; MER Report.) The School District issued a Comprehensive Evaluation Report ("CER") on June 1, 2001. (School District Exhibit ("SD") #10.) J.N.'s CER included conclusions that he was 25% delayed in all areas of development: cognitive, speech and language, gross motor, fine motor, social, emotional and self-help skills. (Id.)

The School District issued a psychological evaluation report on May 30, 2002, which described J.N. as in the "moderately to severe autistic range" with mental retardation. The psychological evaluation included a recommendation of further testing. (Def.'s App. Attach. I.) The psychological report was not included in other CERs prepared for J.N. (ODR Tr. 241-45.)

On July 29, 2002, the School District recommended that J.N. be placed in a full-time life skills support program at an approved private school. J.N.'s mother ("Mrs. N") approved of this

_____

[1]      Def.'s App. (Docket No. 18) Attach. E.

recommendation.  (Def.'s App. Attach. H.)

J.N. was placed in the Education Center at the Watson Institute on September 3, 2002. (SD #9; ODR Tr. 25.)  Watson is an Approved Private School licensed by the State Board of Private Academic Schools and approved by the Secretary of Education to provide a FAPE to students with severe disabilities.  (ODR Tr. 280.)

Upon enrollment, the School District provided Watson with all of J.N.'s educational records, including three CERs and a Report of Psychological Evaluation completed two months prior to his enrollment.  (Def.'s App. Attach. E, F, G, I; ODR Tr. 292.)  The School District actively participated in J.N.'s individualized education program ("IEP") meetings and maintained close contact with Watson.  (Def.'s App. Attach. M, N, O; ODR Tr. 280, 283, 287-88.)

During October of 2003, Watson convened an IEP meeting to review J.N.'s existing evaluations, data and information in order to determine if more formal testing was needed.  At this meeting, the IEP team reviewed the existing evaluation data, information provided by J.N.'s parents, current classroom-based assessments and observations, and observations by teachers and service providers.  (ODR Tr. 201, 203-06, 209-11.)

On October 16, 2003, the School District issued a Reevaluation Report.  (Parents' Exhibit ("P") #4.)  Plaintiff notes that the October 16, 2003 reevaluation form is generally blank, including a statement of information reviewed on page five that is taken directly from 34 C.F.R. § 300.533 as incorporated into 22 Pa. Code Chapter 14 (P #4 and cited legal authority).  Plaintiff notes that Watson personnel were not aware of J.N.'s diagnosis of mental retardation until the 2005-2006 school year.  (ODR Tr. 241-45.)  The IEP team did not include a certified school psychologist when J.N.'s Reevaluation Report was considered.  (P #4.)

Defendant responds that the IEP team determined that no additional data was required because J.N. remained eligible for special education and related services, and the IEP team agreed that enough information existed to continue providing J.N.'s educational program needs. (Def.'s App. Attach. J; ODR Tr. 201, 203-06, 209-11.)

On October 30, 2003, J.N.'s IEP team was convened to prepare a new IEP. (Hearing Officer's Exhibit ("HO") #5.) The October 30, 2003 IEP included goals and objectives to develop imitation skills, use of switches, bilateral tasks, self-feeding skills, increased wait time and self-care skills. (HO #5.)

Defendant argues that J.N. made appropriate progress during the 2004-2005 school year as evidenced by his progress reports that were provided to his parents every quarter. (Def.'s App. Attach. A; ODR Tr. 212.) Mrs. N met with members of Watson's staff on two occasions during the 2004-2005 school year and testified that the quarterly progress reports had been explained to her. (ODR Tr. 101, 368.) She indicated that she was satisfied with J.N.'s progress during the 2004-2005 school year. (ODR Tr. 77-78, 100-01.)

Plaintiff notes that J.N.'s progress report dated June 7, 2004 includes information to the effect that J.N. had mastered three of the twelve objectives on the 2003-2004 IEP. (P #6.)

On October 21, 2004, J.N.'s IEP team met again to develop an IEP. (HO #6.) The October 21, 2004 IEP included goals and objectives to develop receptive language skills, life skills tasks (hanging up coat and backpack; cleaning up after snack or lunch), computer skills, zipping, and ability to make a request. (HO #6.) This IEP was carried over into the 2005-2006 school year. The progress report dated June 6, 2005 includes information to the effect that J.N. had mastered thirteen of thirty objectives on his IEP. (P #7.)

Defendant notes that J.N.'s IEPs from the 2004-2005 and 2005-2006 school years demonstrate that he made progress during both of those years. (Def.'s App. Attach. M, N, O.)

On September 8, 2005, the School District informed the parents that J.N. did not require a reevaluation because Watson continued to collect data, make observations, and there was enough documentation to support continuing the child in special education. (Def.'s App. Attach. K.)

J.N.'s case manager testified that she participated in the 2004 and 2005 IEP meetings and that Watson presented no documentation regarding J.N.'s progress or lack of progress for the team's review. (ODR Tr. 169.) Plaintiff contends that the progress reports did not include a means of reporting "no progress." (ODR Tr. 330-31.) Defendant responds that this is not true, as the speech pathologist/team coordinator at Watson testified that a lack of progress would be indicated on the report either by documentation in the staff comments section and calling the parent or by putting an "R" in the appropriate box with an asterisk to indicate "regression" or "NP" to indicate "no progress." (ODR Tr. 330-31.)

On September 12, 2005, Mrs. N signed an Agreement to Waive J.N.'s reevaluation when it was presented to her by Watson staff. (P #5.) She testified that she thought that she was signing the waiver so that J.N.'s mental health services could be continued despite the lack of an I.Q. test, which she had requested. (ODR Tr. 53-55, 96-97.)

J.N.'s Injuries

There were six documented injuries to J.N. at Watson in the 2005-2006 school year. The first four of these incidents involved the same student in J.N.'s classroom. In each case, an autistic female student prone to impulsive behavior pushed and/or knocked J.N. down in the classroom. (Def.'s App. Attach. B; ODR Tr. 26, 30, 35, 39, 43-44, 222.) At the time of these

incidents, Watson maintained one staff person for every three students in the classroom.  (Def.'s App. Attach. B; ODR Tr. 83.)

J.N. was injured on October 27 and November 9, 2005.  (ODR Tr. 335, 359-61.)  Following the first incident, the classroom teacher and supervisor met and discussed the incident and the teacher restructured the classroom area/design and altered the scheduling of centers within the classroom.  (Def.'s App. Attach. B; ODR Tr. 343-44.)  Following the second incident, the classroom teacher and supervisor developed a plan for monitoring J.N. at all times in the classroom.  Changes were also made to student groupings and scheduling, and extra support was made available to J.N.'s classroom.  (Def.'s App. Attach. B; ODR Tr. 365-66.)

J.N. was injured a third time on December 1, 2005, sustaining a cut to his chin.  (SD #4.)  Following this incident, a meeting was held with Mrs. N, the interim programming director and the classroom teacher's direct supervisor.  (Def.'s App. Attach. C; ODR Tr. 349.)  The result of this meeting was that all Watson staff were notified of J.N.'s safety concerns and additional staff was added to J.N.'s classroom.  (ODR Tr. 365-66.)  Thus, following this incident, the classroom contained one staff person for every two students.  (ODR Tr. 227-28.)  Plaintiff notes that the "extra help" in the classroom was not assigned to J.N. specifically.  (ODR Tr. 226.)  Watson does not permit any Therapeutic Staff Support workers employed by other agencies on the premises during the school day.  (ODR Tr. 228-29.)

On January 18, 2006, J.N. was injured again by the same student who had knocked him down on three previous occasions; he sustained a broken tooth, cut lip, and seizures.  (P #3; SD #3; ODR Tr. 338-41.)  Plaintiff notes that Watson did not request additional support from Pittsburgh Public Schools.  (ODR Tr. 186.)

Following this incident, the Chief Operating Officer and the Program Director met with Mrs. N to discuss changing J.N.'s classroom assignment. However, Mrs. N indicated that she was happy with J.N.'s progress and did not wish to see him moved. As a result, Watson agreed to maintain J.N.'s classroom assignment and relocate the other child to a different classroom. (ODR Tr. 40, 87-88.) Following the removal of the other child, J.N. did not experience any further incidents with classmates in the classroom. (ODR Tr. 89.) Watson paid for J.N.'s dental bills. (ODR Tr. 86.)

The classroom teacher testified that she always felt that she had sufficient support in her classroom. Mrs. N indicated that she was satisfied with the measures taken by Watson after each of these four incidents and she believed that Watson had sufficiently addressed her concerns. (ODR Tr. 82-84, 88, 362-63.)

J.N. was injured on the playground on April 18, 2006. (SD #3; ODR Tr. 346.) This incident occurred when another student who was in the midst of a tantrum slapped him. This occurred despite the fact that a staff member was standing directly next to J.N. (ODR Tr. 42-43, 347.) He was seen by the school nurse and Mrs. N was notified. (ODR Tr. 43.)

On May 10, 2006, J.N. suffered an abrasion from a weighted vest that he wore at Watson. The velcro closure that attached over his shoulder managed to cut a single line on his neck. (SD #3; ODR Tr. 43-44, 92, 369-70.) Upon noticing the abrasion, J.N.'s teacher immediately removed the vest and took J.N. to the nurse. Following this incident, Watson's Program Director and J.N.'s teacher met with Mrs. N to explain what happened. Despite the fact that J.N. enjoyed wearing the vest, the decision was made to substitute a weighted backpack in order to fulfill J.N.'s sensory needs. Mrs. N stated that she was satisfied with the measures taken by Watson.

(ODR Tr. 44, 92-93, 227, 370.)

Mrs. N testified that, with the exception of a half-day absence for a dental appointment for which Watson paid, J.N. did not miss any school as a result of any of the physical injuries that he sustained while at Watson.  (ODR Tr. 88.)

Plaintiff notes that Watson has no protocol for reporting student injuries to sending school districts.  (ODR Tr. 229-32.)  Ms. Trettel, testifying for Watson, stated that she was previously unaware that J.N. received services based on a diagnosis of mental retardation.  (ODR Tr. 239.)

Plaintiff notes that Watson lost paperwork relating to nurse's reports in the 2005-06 school year.  (ODR Tr. 182.)  Watson had some record from nurse's notes of the nurse seeing J.N. on October 27, 2005 and December 1, 2005.  Mrs. N provided paperwork from the hospital emergency room regarding treatment for J.N. on September 15, 2005.  (P #1.)

J.N. mastered no goals in the 2004-2005 school year, but he did master some specific objectives.  (ODR Tr. 252.)  J.N. mastered no objectives in computer or self-help skills in the 2004-2005 school year.  (ODR Tr. 252-53.)

Mrs. N testified that she believed that J.N.'s progress accelerated during the 2005-2006 school year because his wraparound services coordinated with his work at school.  (ODR Tr. 106.)  Defendant notes that Mrs. N was in constant contact with Watson staff because she picked J.N. up from school every day and she was employed by Watson as a classroom aide and kitchen manager.  (ODR Tr. 29, 333.)

<u>Administrative Proceedings</u>

On June 13, 2006, J.N.'s parents submitted a complaint alleging that he had been denied a

FAPE because: 1) he was not properly supervised and was repeatedly injured at Watson; 2) he did not make appropriate progress during the 2004-2005 school year; 3) his verbal skills were not improving and he had not been evaluated for a communication device; 4) his Reevaluation Report was insufficient in scope and information to support programming; and 5) they received only one progress report during the 2005-2006 school year. (Def.'s App. Attach. L.)[2] Defendant notes that it did not receive any kind of notice from J.N.'s parents that they had concerns regarding the appropriateness of J.N.'s programming, or the educational benefit that he was deriving from the programming, at Watson until it received a correspondence from his parents' counsel on June 13, 2006. (ODR Tr. 30, 34, 101, 109-10, 275-76, 279, 289-90.) The School District received all of J.N.'s progress reports and was satisfied that J.N. was making appropriate progress. (ODR Tr. 280-83.) It notes that the complaint did not plead that J.N. made inappropriate progress during the 2005-2006 school year.

Upon receipt of the June 13, 2006 complaint, the School District met with Mrs. N, her counsel and representatives from Watson. (ODR Tr. 276.) The School District and Mrs. N agreed that Pioneer Center, a Pittsburgh Public School, would serve as an appropriate placement for J.N. (ODR Tr. 277.) Mrs. N stated that she is satisfied with J.N.'s placement at Pioneer. (ODR Tr. 278.)

The hearing officer conducted hearing sessions on August 13, 2006, August 14, 2006 and September 15, 2006. On September 28, 2006, the hearing officer determined that J.N. was denied a FAPE in that he did not make appropriate progress during the 2004-2005 school year,

---

[2]    At the due process hearing, the parents withdrew the third and fourth issues and their request for an independent evaluation.

he was not provided with an appropriate Reevaluation Report on October 16, 2003 and he was not properly supervised and monitored at Watson. (Def.'s App. Attach. P at 8-11.) The hearing officer determined that J.N. was entitled to compensatory education in the form of five full school days per week for each school week of appropriate special education and related services denied from the start of the 2004-2005 school year through the end of the 2005-2006 school year.

The School District appealed. On October 27, 2006, the Special Education Due Process Appeals Review Panel ("Appeals Review Panel") reversed the hearing officer's order. (Def.'s App. Attach. Q at 10.) The Appeals Review Panel concluded that: 1) the hearing officer should not have decided the appropriateness of the October 16, 2003 Reevaluation Report because of the running of the statute of limitations, and even reaching the merits of this report the hearing officer's reasoning was off point because the evidence was more than sufficient that the School District complied with the relevant regulation regarding reevaluation; 2) the hearing officer erred in concluding that the parents met their burden to demonstrate that the IEP for the 2004-2005 school year was not calculated to yield a meaningful benefit in light of J.N.'s potential; and 3) the hearing officer erred in concluding that J.N. was denied a FAPE for the 2005-2006 school year based on the injuries he received without evidence that he suffered a loss of education.

Procedural History

Plaintiff filed this action on December 28, 2006. He contends that the Appeals Review Panel's reversal of the hearing officer's ruling in his favor was contrary to law, not supported by the evidence of record and characterized by bias. He seeks a declaratory judgment that he has been deprived of a FAPE under the IDEA and the award of compensatory education, attorney's fees and costs and such other relief as the Court finds appropriate. On September 25, 2007, the

parties filed cross-motions for summary judgment.

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

IDEA Requirements

The IDEA seeks to ensure that "all children with disabilities have available to them a free appropriate public education." 20 U.S.C. § 1400(d)(1)(A). To that end, the IDEA requires all states receiving federal funding under the Act to provide a FAPE. 20 U.S.C. § 1412(a)(1)(A). A FAPE is defined as:

special education and related services that--

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9). "Where a state fails to satisfy this statutory mandate, parents have a right to reimbursement for private school tuition." T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000) (citing Burlington v. Department of Educ. of Commw. of Mass., 471 U.S. 359, 370 (1985)).

The "IEP Team," which is composed of the child's parents, teachers, a representative of the local educational agency and, where appropriate, the child, 20 U.S.C. § 1414(d)(1)(B), is required to create an IEP for each disabled child in accordance with section 1414(d). 20 U.S.C. § 1401(14). The local educational agency is required to ensure that the IEP Team reviews and, where appropriate, revises the IEP at least annually. 20 U.S.C. § 1414(d)(4).

If parents believe that their child's IEP is inappropriate, they may request an "impartial due process hearing," § 1415(f). Any party aggrieved may file an appeal to the State educational agency if the initial hearing is held at the local or regional level, § 1415(g), and appeal therefrom may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy, § 1415(i)(2-3)). The court shall receive the records of the administrative proceeding, hear additional evidence at the request of the parties and, basing its decision on the preponderance of the evidence, grant such relief as it deems appropriate. § 1415(i)(2)(C).

In Schaffer v. Weast, 546 U.S. 49 (2005), the Supreme Court held that the party seeking relief bears the burden of proof. Thus, in this case, the parents, who requested an impartial due process hearing, bear the burden of proof.[3] "When deciding an IDEA case, the District Court applies a modified version of de novo review and is required to give due weight to the factual findings of the [state agency]." L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 (3d Cir. 2006) (citations omitted).

However, in a two-tiered system,[4] such as that employed by Pennsylvania, when the appeals panel reaches a result contrary to that of the hearing officer, the Court of Appeals has held that the appeals panel shall "exercise plenary review, except that they should defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995). The district court "should still give 'due weight' to the appeals panel's decision when it reverses the hearing officer's conclusions of law, inferences from proven facts and factual findings based on credibility judgments where non-testimonial, extrinsic evidence justified the appeals panel's contrary decision." Id. (footnote omitted). The court assumed, without deciding, that a district court should accord somewhat less consideration to an appeals panel's ruling that disregards a hearing officer's credibility judgments where this standard is not met. Id. n.4.

---

[3]      Plaintiff argues that Schaffer applies only in a situation in which the evidence is "in equipoise." Although that was the factual scenario in Schaffer, the Court's holding is not so limited.

[4]      Pennsylvania employs a two-tiered system, in that the initial decision is made by a hearing officer, 22 Pa. Code § 14.162(f-g) and it may be appealed to a panel of three appellate hearing officers, 22 Pa. Code § 14.162(*o*).

The Supreme Court has concluded that the phrase "free appropriate public education"

contains:

> the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education. The statutory definition of "free appropriate public education," in addition to requiring that States provide each child with "specially designed instruction," expressly requires the provision of "such ... supportive services ... as may be required to assist a handicapped child to benefit from special education." We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.

Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 200-01 (1982) (footnote and

citations omitted). The Court held that a state:

> satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

Id. at 203-04 (footnote omitted). It concluded that:

> a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

Id. at 206-07 (footnotes omitted).[5]

---

[5] Section 1415(e)(2) is now § 1415(i)(2)(C).

At one time, the Court of Appeals interpreted <u>Rowley</u> to require that an IEP offer "more than a trivial or de minimis educational benefit." <u>Oberti v. Board of Educ. of Borough of Clementon Sch. Dist.</u>, 995 F.2d 1204, 1213 (3d Cir. 1993). However, more recently, the court has clarified that "more than a trivial benefit" does not meet the "meaningful benefit" requirement. <u>T.R. v. Kingwood Twp. Bd. of Educ.</u>, 205 F.3d 572, 577 (3d Cir. 2000) (citing <u>Polk v. Central Susquehanna Intermediate Unit</u>, 853 F.2d 171, 184 (3d Cir. 1988)). "The education provided must be sufficient to confer some educational benefit upon the handicapped child, although the state is not required to maximize the potential of handicapped children." <u>Id.</u> (citations omitted).

<u>The October 16, 2003 Reevaluation Report</u>

The hearing officer determined that the October 16, 2003 Reevaluation Report was insufficient because it remained in effect until J.N. was evaluated again on August 8, 2006 even though it "contained virtually no information," it failed to consider the previous diagnosis of mental retardation and Mrs. N's waiver was therefore invalid. (Def.'s App. Attach. P at 10-11.) The Appeals Review Panel found that the hearing officer should not have considered the Report because of the statute of limitations and that her reasoning based on the mental retardation diagnosis and the parental waiver was off point, given the undisputed evidence of the infeasibility of IQ and other such testing of J.N. and the ample evidence of his needs and progress based on Watson's systematic data collection and review.

Plaintiff contends that the Appeals Review Panel erred in its legal conclusion that a two-year statute of limitations barred review of the October 16, 2003 Reevaluation Report. Defendant responds that the Appeals Review Panel correctly determined that consideration of

this report is barred by the running of the statute of limitations. The Court need not resolve this issue because, even assuming that the statute of limitations did not bar consideration of the Reevaluation Report, the Appeals Review Panel correctly determined that Watson collected data about J.N.'s progress at least twice a week and reviewed it at least bimonthly, culminating in a data review meeting with the parents preparatory to the IEP. (ODR Tr. 209-10, 237.) The Appeals Review Panel noted that the regulation regarding reevaluation in effect at the time provided that:

> (1) If the determination under paragraph (a) of this section is that no additional data are needed to determine whether the child continues to be a child with a disability, the public agency shall notify the child's parents–
>> (I) Of that determination and the reasons for it; and
>> (ii) Of the right of the parents to request an assessment to determine whether, for purposes of services under this part, the child continues to be a child with a disability.
> (2) The public agency is not required to conduct the assessment described in paragraph (d)(1)(ii) of this section unless requested to do so by the child's parents.

34 C.F.R. § 300.533(d) (2005). As Defendant notes, Mrs. N was a member of this IEP Team and she signed the Reevaluation Report indicating that these procedures had been followed. (Def.'s App. Attach. J.)

Plaintiff argues that "The Appeals Panel decision does not find that the reevaluation is appropriate; the decision holds that the parent could not raise the issue of the sufficiency of the reevaluation because the parent did not request the hearing within two yeas of October 16, 2003." (Docket No. 17 at 3-4.) This is inaccurate. As cited above, the Appeals Review Panel held in the alternative that the hearing officer's reasoning was off point and that the undisputed evidence demonstrated that the School District had complied with the relevant regulation regarding reevaluation. Plaintiff has not demonstrated that Appeals Review Panel's conclusions regarding

the Reevaluation Report is not entitled to due weight or that it is not supported by a preponderance of the evidence.

The 2004-2005 School Year

The hearing officer found that the progress reports for the 2004-2005 school year left the parents with "delimited knowledge" and that the School District did not make sufficiently clear the reasons for the differences between the goals/objectives of the October 12, 2005 IEP and those of the previous IEP. (Def.'s App. Attach. P at 9-10.) The Appeals Review Panel found that "the format and explanation of the quarterly progress reports provided the Parents with a reasonable opportunity for meaningful participation in the process and that the differences in the goals/objectives of the 10/3/04 IEP from those in the 10/3/03 IEP were not fatal in terms of substantive appropriateness." (Def.'s App. Attach. Q at 9-10) (footnotes omitted). The Panel further concluded that:

> Although the progress data for the previous year were incomplete in the record, which neither the parties nor the hearing officer apparently noticed, the format and explanation were sufficient for the parents to play a meaningful role in the IEP process. Similarly, the testimony was adequate to show a reasonable basis for the transition from the earlier IEP to the 10/3/04 IEP (as well as from the 10/3/04 IEP to the next one) in terms of the systematic progress reports and maturing needs of the Student. Neither the testimony nor the IEPs were optimal in this respect, but the Parents[] did not prove that this aspect invalidated them in terms of the applicable or procedural standard.

(Id. at 10) (footnotes omitted).

The Appeals Review Panel did not reverse credibility findings made by the hearing officer. See Def.'s App. Attach Q at 9 n.43 ("The hearing officer's findings in this regard do not appear to be credibility judgments, but in any event we find that the record as a whole compels a contrary conclusion.")

Defendant argues that Plaintiff did not meet his burden of demonstrating inappropriate progress during the 2004-2005 school year. It contends that Plaintiff has not established by a preponderance of the evidence that the IEP was not calculated to yield a meaningful benefit in light of J.N.'s intellectual potential. The Appeals Review Panel specifically made this finding and furthermore concluded that the format and explanation of the quarterly progress reports provided Plaintiff's parents with a reasonable opportunity for meaningful participation in the process and that the differences and objectives in the goals/objectives of the October 3, 2004 IEP from those in the October 3, 2003 IEP were not fatal in terms of substantive appropriateness. Finally, the Appeals Review Panel found that the testimony was adequate to show a reasonable basis for the transition from the earlier IEP to the October 3, 2004 IEP in terms of the systematic progress reports and maturing needs of J.N. (Def.'s App. Attach. Q at 9.)

Plaintiff contends that he mastered only five of twenty-one objectives included in his 2004 IEP. Defendant responds that the 2004-2005 progress report in fact indicates that he mastered seven objectives and that he was progressing in twelve of the remaining twenty-one objectives, thus he had mastered or was progressing in nineteen of the twenty-one objectives.

Plaintiff argues that the progress reports did not include a provision for reporting "no progress." Defendant responds that this is not true, as the speech pathologist/team coordinator at Watson testified that a lack of progress would be indicated on the report either by documentation in the staff comments section and calling the parent or by putting an "R" in the appropriate box with an asterisk to indicate "regression" or "NP" to indicate "no progress." (ODR Tr. 330-31.)

Plaintiff points to the fact that Watson staff indicated in the 2004-2005 progress reports that he needed more prompting to activate switches appropriately, and that he continued to need

maximal assistance to close a zipper, and generally asserted that he was not progressing with self-care. However, Defendant responds that Plaintiff was mastering or progressing in all of the other goals of his 2004 IEP. Furthermore, staff comments of the 2004-2005 progress report indicated that "we have seen gains in toilet training." (Def.'s App. Attach. A at 26.)

Plaintiff argues that certain objectives from the 2004 IEP were not included in the 2005 IEP. The Appeals Review Panel observed that neither the parents nor the hearing review officer identified any precedents where the transition of goals/objectives from one IEP to the next constituted a per se denial of a FAPE. (Def.'s App. Attach. Q at 10 n.48.) Defendant also notes that Watson's program director testified that several factors are considered when evaluating the goals and objectives from one IEP to the next and that this decision is made by the IEP Team. These factors include: whether the student was beginning to make progress, whether the team felt that the goal/objective was particularly important, and whether the extent of the student's progress requires an adjustment in the goals/objectives. (ODR Tr. 192-93.) The Appeals Review Panel found that Watson adequately complied with these procedures. (Def.'s App. Attach. Q at 7.)

Plaintiff argues that the progress made during the 2004-2005 school year was the result of work done at home with the wraparound provider, which coincided with his work at school. (ODR Tr. 106.) Defendant observes that this is precisely the manner in which wraparound services are intended to function and that Plaintiff's argument does not support the claim of inappropriate programming but in fact supports the proposition that both J.N.'s programming and progress were appropriate.

Plaintiff has not demonstrated that Appeals Review Panel's conclusions regarding the

2004-2005 school year are not entitled to due weight or that they are not supported by a preponderance of the evidence.

<u>The 2005-2006 School Year</u>

The hearing officer concluded that J.N.'s "repeated injuries at Watson were tragic and unfortunate, infringing on [his] right to a FAPE." (Def.'s App. Attach. P at 9.) She relied on the student safety provisions of the No Child Left Behind Act of 2001 ("NCLB") and a district court case, <u>Nordo v. School District of Philadelphia</u>, 172 F. Supp. 2d 600 (E.D. Pa. 2001). (<u>Id.</u> at 8.)

The Appeals Review Panel found that:

> the law is clearly contrary to the hearing officer's FAPE ruling for 2005-06. First, her reliance on the NCLB's school safety provisions was misplaced, because they are beyond the hearing officer's authority; to the limited extent, if any, that the NCLB allows a private right of action, it would be to court, not to an IDEA hearing officer. Second, the cited federal court decision was based on the Fourteenth Amendment, not the IDEA, and–even worse–the decision was against, not in favor of, the plaintiff-parents. The parties have not cited, and we do not know of, any IDEA case law where the courts predicated FAPE on the safety of a student in the absence of a resulting loss of education.

(Def.'s App. Attach. Q at 10-11) (footnotes omitted).

The IDEA provides that:

> In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies--
>
> (I) impeded the child's right to a free appropriate public education;
>
> (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
>
> (III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii). Thus, a procedural violation alone, which does not meet one of the

three enumerated requirements, does not result in the denial of a FAPE.

As Defendant notes, Plaintiff has cited no case in which a court has predicated a denial of FAPE on the safety of the student in the absence of a resulting loss of education.  On the contrary, courts have held that a claim under the IDEA is viable only if procedural violations affect a child's substantive rights.  Lesesne ex rel. B.F. v. District of Columbia, 447 F.3d 828, 834 (D.C. Cir. 2006).  See also MM ex rel. DM v. School Dist. of Greenville County, 303 F.3d 523, 534 (4th Cir. 2002) ("If a disabled child received (or was offered) a FAPE in spite of a technical violation of the IDEA, the school district has fulfilled its statutory obligations."); W.G. v. Board of Trustees of Target Range Sch. Dist. No. 23, 960 F.2d 1479, 1484 (9th Cir. 1992); Thomas v. Cincinnati Bd. of Ed., 918 F.2d 618, 625 (6th Cir. 1990) (same); Roland M. v. Concord Sch. Committee, 910 F.2d 983, 994 (1st Cir. 1990) (en banc) (same).

As the Appeals Review Panel noted, the only case that comes close to this situation is Shore Regional High School Board of Education v. P.S., 381 F.3d 194 (3d Cir. 2004).  In that case, P.S. was subjected to years of bullying from other students based on his physique, eventually leading to his being found eligible for special education on the basis of emotional disturbance.  When P.S. reached high school age, his parents attempted to enroll him in a school other than the high school serving his community (Shore), but the school district objected, concluding that Shore would be the least restrictive environment.  An Administrative Law Judge (ALJ) heard four days of testimony and concluded that Shore could not provide P.S. with a FAPE because of the legitimate fear that the same harassers who had followed him throughout elementary and middle school would continue to bully him.  In other words, the pervasive peer harassment not only caused his disability but also precluded the district's placement from

meeting his needs.  Shore then filed suit and the district court reversed the ALJ's decision, crediting a witness for Shore and discrediting witnesses found credible by the ALJ.  The Court of Appeals found that the district court erred in failing to give due weight to the ALJ's determination or explain why it was rejecting credibility findings made by the ALJ.

In this case, the review is based upon the decision of the Appeals Review Panel, and the issue of least restrictive environment is not involved.  More significantly, the record does not demonstrate that J.N. had more than a de minimis loss of education as a result of the incidents, whether measured in terms of actual days missed or progress impeded.  On the contrary, even his parents indicated that he progressed rather well in spite of them.  (ODR Tr. 88, 157.)  As the Appeals Review Panel observed, the parents "insisted that [J.N.] remain in the same classroom, and that Watson move instead, the other student, who also had individual rights and protections under the IDEA."  (Def.'s App. Attach. Q at 11 n.54.)  Thus, this case is distinguishable from a case such as Shore.

Plaintiff contends that J.N. suffered a loss of education even though he did not miss any school as a result of the physical injuries he sustained.  He points to the seizures he suffered at school following the incidents and contends that he suffered head injuries that rendered him incapable of meaningful participation in classroom instruction.

Defendant responds that Plaintiff offers no medical documentation or expert testimony linking his injuries and the seizures he suffered.  It further notes that Mrs. N testified that he had a history of seizures prior to sustaining the injuries.  (ODR Tr. 86.)  In addition, Plaintiff has failed to offer any medical documentation or expert testimony that establishes the existence of a head injury that would have impaired J.N.'s ability to meaningfully participate in classroom

instruction.

Plaintiff has not demonstrated that J.N.'s substantive rights were affected. Therefore, even assuming that the physical injuries he suffered constituted a procedural violation of the IDEA, he has not established that he is entitled to relief. Plaintiff has not demonstrated that Appeals Review Panel's legal conclusions regarding the 2005-2006 school year are not entitled to due weight or that it they not supported by a preponderance of the evidence.

<u>Monitoring J.N.'s Placement at Watson</u>

The hearing officer concluded that J.N. was improperly supervised and monitored at Watson because the pattern of incidents from which his injuries arose was foreseeable, there was a showing that the incidents from which his injuries arose were due to Watson's failure to take reasonable steps to prevent them, his injuries did not receive monitoring and the School District was unaware of his injuries until his parents obtained counsel. (Def.'s App. Attach. P at 8-9.)

The Appeals Review Panel found that:

although neither professionally optimal nor callously indifferent, Watson took relatively responsive and escalating steps to protect the Student's safety within a milieu where, despite a high staff-student ration, the nature and severity of the disability of the client population poses a daunting risk of injury to staff and fellow students....

Finally, as a matter of dicta, we acknowledge that Watson arguably could have reacted more expeditiously in protecting the Student, including more effective services or strategies for his aggressing classmate. This retrospective assessment notwithstanding, we must return to the underlying question that lies at the heart of our inquiry–what was the Student's educational deprivation? This record does not sufficiently establish that the collective effect of the incidents in question substantially undermined the Student's educational progress during the 2005-06 school year amount amounted to a denial of FAPE, which is the requisite for compulsory education. While we emp[]athize with the Parents' concern for the safety of their child, who is certainly entitled to special attention, our authority is based on law, not emotion, and the IDEA plainly does not offer the remedy of compulsory education for the specific series of limited injuries incurred by the

Student in the circumstances evidenced in this record.

(Def.'s App. Attach. Q at 12-13) (footnotes omitted).

Defendant argues that Plaintiff has failed to demonstrate that the School District violated any provision of the IDEA in alleging that it failed to properly monitor his placement at Watson. Plaintiff has not alleged any violation of 20 U.S.C. § 1412(a)(10)(B) or 34 C.F.R. § 300.325, which relate to children placed in, or referred to, private schools by public agencies. Defendant notes that it participated in all of J.N.'s IEP Team meetings during his placement at Watson, received all progress reports, and maintained continuous contact with Watson regarding J.N.'s placement there. (Def.'s App. Attach. M, N, O; ODR Tr. 280, 283, 287-88.) Upon receiving notice of the safety concerns, Defendant convened the IEP Team and removed J.N. from Watson. The IEP Team placed J.N. at another appropriate placement (Pioneer Center) for the 2006-2007 school year. (ODR Tr. 276-78.)

To the extent that Plaintiff argues that J.N. was improperly supervised at Watson, leading to him being repeatedly injured, Defendant argues that he was not improperly supervised and that lack of supervision was not the proximate cause of his injuries. It notes that it reacted immediately and appropriately following each incident. Although hindsight makes it appear that Watson's reactions to the injuries were insufficient (because J.N. was injured again), the issue is whether Watson's responses were reasonable under the circumstances presented at the time. Defendant points to the testimony in the record that the child who injured J.N. acted impulsively, so it was not predictable (ODR Tr. 362-64), that the classroom teacher met with Mrs. N after each incident and Mrs. N agreed with the actions Watson was taking (ODR Tr. 82-84, 88, 365, 382), that the room was constantly supervised by at least three staff persons and often by six

adults (ODR Tr. 227-28), that after the third incident Watson made additional staff support available to J.N.'s classroom teacher (ODR Tr. 366), that after each incident the teacher changed scheduling to avoid contacts between J.N. and the other child (ODR Tr. 379-80), that after the fourth incident the other child was removed from J.N.'s classroom (ODR Tr. 384), that the incident on the playground occurred despite a staff member standing directly next to J.N. (ODR Tr. 346-47), and that the incident with his vest would have occurred with or without supervision (ODR Tr. 369).

Plaintiff has not demonstrated that Appeals Review Panel's conclusions regarding the issue of J.N. being properly supervised at Watson are not entitled to due weight or that they are not supported by a preponderance of the evidence.

Allegations of Bias

Plaintiff argues that the decision of the Appeals Review Panel is characterized by bias. This argument appears to be based on the facts that the decision was written by Appellate Officer Perry Zirkel, that in other decisions (but not this case), Professor Zirkel cites frequently to his own published articles in this area of the law,[6] and that of the 49 cases assigned to the panel chaired by Professor Zirkel between August 2003 and August 2005 he authored 85% of them and the school districts always prevailed. (Docket No. 17 Ex. B.) Defendant argues that this argument is moot because, if Plaintiff believed the panel was biased, he could have requested that the case be reassigned to a different panel. It further argues that the argument is unsupported by the record.

---

[6]     The Court of Appeals has also cited Professor Zirkel's articles in its opinions. See <u>M.C. ex rel. J.C. v. Central Regional Sch. Dist.</u>, 81 F.3d 389, 397 (3d Cir. 1996); <u>Carlisle</u>, 62 F.3d at 527, 529.

Plaintiff's allegations of bias are not supported by evidence. He has not pointed to evidence of bias by Professor Zirkel or the Appeals Review Panel in this case. Whatever may have occurred in other cases is not before the Court in this matter.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Plaintiff (Docket No. 15) be denied. It is further recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 20) be granted.

Within thirteen (13) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: January 8, 2008